# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSE
### NASHVILLE DIVISION

PORTER STADAKER,
LEE DUNBAR, DARRELL POWE
and RAYMOND THOMAS,
individually and on behalf of all
other similarly situated persons,

     Plaintiffs,

vs

No

AMERIQUEST MORTGAGE
COMPANY,

     Defendant

**3 - 0 7 -  0 4 0 9**

**CLASS ACTION
JURY DEMANDED**

---

## CLASS ACTION COMPLAINT

---

Plaintiffs, Porter Stadaker, Lee Dunbar, Raymond Thomas, and Darrell Powe bring this

action both individually and on behalf of the class of persons defined below against Ameriquest

Mortgage Company, (hereinafter referred to as "Ameriquest" or "Defendant"), and pursuant to

their investigation, upon knowledge as to themselves and their own acts and otherwise upon

information and belief, for their Class Action Complaint allege as follows:

## NATURE OF THE CASE

1    This is a class action seeking redress for a nationwide scheme of racial

discrimination in which Defendant Ameriquest has targeted African-Americans for "subprime

loans," and through high-pressure sales tactics, misleading marketing, and other deceptive

lending practices has exploited those African-Americans by coercing and defrauding them into taking predatory residential mortgage loans. As used herein, the term "predatory loans" includes loans that contain higher interest rates than the borrower was otherwise qualified to receive, excessive or hidden fees and costs, pre-payment penalties or other unfairly disadvantageous loan terms or are in a principal amount exceeding the true value of the residence securing the loan as of the closing of the loan. The term "predatory loans," as used herein, also includes loans which Ameriquest knows or has reason to know African-American borrowers will not likely be able to repay.

2       This action is brought by Plaintiffs as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all African-American borrowers throughout the Nation who have a predatory, subprime loan from Defendant Ameriquest secured by a mortgage on the borrower's residence (hereinafter collectively referred to as the "Class" or "Class Members").

3       Plaintiffs seek damages, including punitive damages, as well as injunctive, declaratory, and other equitable relief for Ameriquest's discriminatory conduct.

## JURISDICTION AND VENUE

4.      The Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(4), or 42 U.S.C. §3613(a) for Plaintiffs' claims of violations of 42 U.S.C. §1981, 42 U.S.C. §1982, 42 U.S.C. §3604, and 42 U.S.C. §3605.

5       Venue is proper in this District because Defendant maintains offices in this state and conducts business within the state and in this District. In addition, at least one of the named

Plaintiffs reside in this District, and the loan contract between at least one of the named Plaintiffs and Defendant was made and its obligations arose in this District.

## THE PARTIES

6.    Plaintiff Porter Stadaker is an African-American and at all relevant times, was and is a resident of Nashville, Tennessee. As a result of Ameriquest's discriminatory and deceptive conduct, Mr. Stadaker currently has a predatory loan with Ameriquest secured by a mortgage on his home in Nashville.

7.    Plaintiff Lee Dunbar is an African-American and at all relevant times was and is a resident of Omaha, Nebraska. As a result of Ameriquest's discriminatory and deceptive conduct, Mr. Dunbar currently has a predatory loan with Ameriquest secured by a mortgage on his home in Omaha.

8.    Plaintiff Raymond Thomas is an African-American and at all relevant times was and is a resident of Fort Worth, Texas. As a result of Ameriquest's discriminatory and deceptive conduct, Mr. Thomas currently has a predatory loan with Ameriquest secured by a mortgage on his home in Fort Worth.

9.    Plaintiff Darrell Powe is an African-American and at all relevant times was and is a resident of Heidelburg, Mississippi. As a result of Ameriquest's discriminatory and deceptive conduct, Mr. Powe currently has a predatory loan with Ameriquest secured by a mortgage on his home in Heidelburg.

10.    Defendant Ameriquest Mortgage Company is organized under the laws of the State of Delaware, and it maintains its principal office in Orange, California. Defendant

Ameriquest Mortgage Company is a wholly owned subsidiary of Ameriquest Capital Corporation.

## AMERIQUEST'S DISCRIMINATORY, DECEPTIVE AND OTHER WRONGFUL ACTS

11      Ameriquest is in the business of making "subprime loans." Borrowers who have low income or who have credit deficiencies are known in industry parlance as "subprime borrowers." Subprime borrowers are in contrast to "prime" borrowers, who have the highest income or best credit profiles, and"Alt-A" borrowers, who have income and credit attributes between those two categories. As a subprime lender, Ameriquest focuses on making loans to individuals falling into what the industry defines as the "subprime category," i.e. those with lower income or credit deficiencies, and secures those loans with mortgages on these individuals' residential property. Loans to borrowers falling into the lending industry's subprime classification are "subprime loans."

12      Ameriquest and its parent company, Ameriquest Capital, are giants in the subprime lending industry. For example, upon information and belief, Ameriquest Capital earned $1 billion on $41 billion of loans it produced in 2003; and in 2004, Defendant Ameriquest was responsible for producing almost a third of the $83 billion in loans generated by Ameriquest Capital.

13      In order to inflate its revenues and reap even more profit, Ameriquest has knowingly and intentionally engaged in racially discriminatory practices involving the target-marketing of African-Americans for subprime loans and then exploiting those African-Americans by coercing or defrauding them into taking predatory loans, that is, loans with higher

4

interest rates, excessive or hidden fees and costs, pre-payment penalties and other unfairly disadvantageous loan terms or loans in a principal amount exceeding the value of the home securing the loan at the time of closing. Virtually all of Ameriquest's predatory loans are adjustable rate loans, meaning that after a relatively short introductory period, perhaps one to two years, the initial interest rate will be adjusted to a significantly higher amount for the remaining life of the loan, usually another 28 or 29 years. Ameriquest's efforts to foist predatory loans on African-Americans through targeted marketing techniques has had a disparate impact on African-American borrowers, resulting in African-Americans, as a group, having less favorable loan terms than similarly situated Caucasians.

14. The first step of Ameriquest's racially discriminatory scheme is to locate and then target African-Americans with misleading sales pitches and marketing materials. Ameriquest identifies African-Americans by sending direct mail pitches and making intensive cold-calling sessions into minority and low-income neighborhoods. Ameriquest also uses door-to-door canvassing in minority and low-income neighborhoods as a way to locate potential African-American borrowers.

15. Ameriquest also locates potential African-American borrowers through the use of credit information about borrowers, including credit scores, and through the use of automated, computerized software such as "Empower" and other automated underwriting tools.

16. Once Ameriquest identifies potential African-American borrowers, it uses high-pressure and misleading sales tactics to coerce these individuals into accepting loans with higher interest rates and greater up-front fees and costs. Ameriquest also routinely fails to disclose pre-payment penalties and misrepresents the affect adjustable interest rates will have on the borrower's monthly payment. Moreover, Ameriquest uses these same high-pressure and

misleading sales tactics to convince African-American borrowers to take loans with monthly payments that will exceed the borrowers' monthly income and ability to repay once relatively short-term teaser rates expire or to take loans with principal amounts greater than the value of the underlying home securing the loan, thereby putting these minority victims in danger of losing their homes.

17. The high pressure and misleading sales practices Ameriquest uses to exploit African-Americans include "bait and switch" tactics, whereby Ameriquest first quotes lower interest rates and fees to entice borrowers to apply for loans and then surprises borrowers at closing with loans having higher interest rates or other disadvantageous terms. Other such tactics include encouraging borrowers to falsify information on loan application documents or simply completing loan application documents with false information without the knowledge of the borrower, as well as outright lying to borrowers about the borrowers' abilities to refinance adjustable rate loans when introductory teaser rates are set to rise to unconscionable levels.

18. Yet another tactic Ameriquest frequently uses to exploit African-American borrowers is to intentionally overvalue the underlying property that will secure the loan. Ameriquest does this through the use of in-house or captive appraisers who are instructed to inflate their appraisals and also through the reliance on inflated appraisals from third-party appraisers that Ameriquest knows, or has reason to know, are inaccurate. Based upon these inflated appraisals, Ameriquest convinces African-American borrowers to take loans which doom those borrowers to foreclosure because they will not be able to make their monthly payments when the introductory or initial interest rates increase and will not be able to refinance the loan because the amount owed greatly exceeds the value of the home.

6

19.     Ameriquest's target-marketing to African-Americans and the high pressure and misleading sales practices described herein are a regular and systemic business practice of the company. Ameriquest trains and requires employees to use the techniques described in paragraph 14 to locate potential African-American borrowers. Similarly, Ameriquest trains and requires its employees to use the high-pressure and misleading sales practices described in paragraphs 16, 17 and 18 once its employees have located potential African-American borrowers. Ameriquest even provides financial incentives to its employees to encourage them to use these marketing and sales tactics. Moreover, Ameriquest provides employees with uniform materials, training, tools and assistance to perpetuate and ensure the use of the marketing and sales tactics referenced herein.

20.     Ameriquest acts with total disregard of these potential devastating consequences for African-American borrowers because the high up front fees and costs Ameriquest obtains from these borrowers offset any potential losses Ameriquest might incur should any particular African-American borrower be unable to perform on his or her loan. In addition, Ameriquest often resells its loans, thereby deferring or completely avoiding the consequences of making loans that Ameriquest knows borrowers cannot afford.

21.     Ameriquest intentionally targets African-Americans on the basis of their race in part because of Ameriquest's belief that African-Americans will be more willing to accept onerous loan terms and conditions than Caucasian borrowers and will be more trusting of its misleading and deceptive sales-practices. Indeed, Ameriquest takes advantage of the fact that African-American borrowers historically have had more difficulty than Caucasians in obtaining credit from traditional financial institutions such as banks. Ameriquest exploits the difficulties African-Americans have faced in obtaining credit and uses this unmet need within the African-

7

American community as a way to charge higher interest rates, greater fees, and otherwise impose more onerous, deceptive, or misleading loan terms and conditions than it would be able to charge Caucasian borrowers.

22. Ameriquest's current discriminatory scheme is a continuation of discriminatory practices that its predecessor, Long Beach Mortgage Company, engaged in during the 1990's and which lead to allegations by the U.S. Department of Justice that it intentionally and willfully engaged in discriminatory practices in violation of the Equal Credit Opportunity Act and the Fair Housing Act. Long Beach Mortgage Company entered into a $4 million settlement with the Department of Justice to resolve these charges. Less than one year after resolving the Department of Justice case, Long Beach Mortgage Company changed its name to Ameriquest Mortgage Company. Around the same time, Long Beach Financial Services, Long Beach Mortgage Company's parent company, changed its name to Ameriquest Capital Corporation.

23. Thus, at all times material to this suit, Defendant acted with a discriminatory intent and was motivated by racial animus. Further, at all material times, Defendant acted in a manner that resulted in a disparate impact on African-Americans. Defendant continues to discriminate against Plaintiffs and Class Members as alleged below. Defendant's systemic, discriminatory conduct includes, *inter alia*, targetingAfrican-Americans for predatory loans which has had a disparate impact on African-American borrower, resulting in African-Americans, as a group, receiving less favorable loan terms than similarly situated Caucasians.

24. Defendant has achieved its discriminatory goal of lending large numbers of African-Americans less favorable loans through use of the artifices described above by systematically and by routinely exposing African-Americans to marketing for its subprime loans while not exposing Caucasians in a similarly situated position to the same media campaign

Implementation of this strategy has resulted in a disparate impact on African-Americans seeking home mortgage loans.

25. Defendant has failed to instruct, supervise, or monitor the performance of its employees and brokers to ensure that loan proposals lead to compliance with fair lending laws and civil rights laws.

26. Plaintiffs and Class Members have lost and face losing millions of dollars in payments on predatory, subprime loans and in foreclosure losses and costs as a result of unfair marketing and lending due to Ameriquest's racial discrimination.

27. Defendant has received millions of dollars of income by virtue of its discriminatory, fraudulent, deceptive, and overreaching marketing and lending practices.

28. Ameriquest's subprime loans, specifically targeted towards African-Americans via uniform and systemic marketing schemes, and loaned to Plaintiffs by Defendant, are racially discriminatory, excessive, unfair, unconscionable, unlawful, and unreasonable and were designed to and have yielded a rate of return on these loans products for Defendant which is excessive and unreasonable.

## ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

29. Plaintiffs and Class Members did not know and could not reasonably have known that they would or that they did borrow loans on terms which were unreasonably unfair and on different terms than loans given to Caucasians on Defendant's loans. Their claims did not accrue until shortly before the filing of this action.

30. Defendant's discriminatory scheme was, by design and in practice, inherently self-concealing. Defendant knew that Plaintiffs and Class Members could not determine the relationship between the terms of the subprime loans they were borrowing in comparison to those loans widely marketed and available to Caucasians. Defendant knew that the subprime loans lent to African-Americans, and the marketing schemes behind these loans, unbeknownst to African-Americans, were substantially more unfair than comparable loans made to Caucasians

31. Upon information and belief, the decisions to lend and to heavily market discriminatory loans to African-Americans and to conceal Defendant's discriminatory practices were made more than five years ago and even as early as the 1990's. However, Defendant intentionally continues to discriminate and knowingly conceals its racially discriminatory practices Although the initial decisions by Defendant to discriminate and to conceal were made years ago, Defendant has repeatedly elected to continue the concealment of its discriminatory practices and has acted in accordance with this decision throughout the limitations period.

32. All of Defendant's enforcement efforts of the loans were independently discriminatory, thus renewing the statute of limitations

33. At no time did Defendant train or encourage its agents to explain the different treatment between African-Americans and Caucasians to Plaintiffs or Class Members or to notify its African-American borrowers that they were borrowing inferior loans than those made to similarly situated Caucasians.

34. Plaintiffs and Class Members were unable to determine from the face of their loans that their loans uniformly bore unreasonable terms because of their race or that they were targeted for the borrowing of these unreasonable loans because of their race. The terms of Defendant's loans have been determined based on a number of undisclosed factors which were

10

not revealed to its borrowers. Thus, even if Class Members had attempted to inquire about the terms of their loans, they could not have discovered Defendant's unfair and illegal practices.

35     Defendant systematically and uniformly trained its employees not to disclose the existence of discriminatory loan terms. Defendant never disclosed its discriminatory practices in any of its loans or sales and marketing materials provided to Plaintiffs or the Class. Defendant never disclosed to Plaintiffs or Class Members that the terms of Defendant's loans and Defendant's discriminatory marketing scheme had a disparate impact on African-American borrowers.

36.     As a result of the foregoing, Plaintiffs and Class Members in the exercise of due diligence could not have reasonably discovered the discriminatory lending and other deceptive and discriminatory practices and did not do so until just recently. For the reasons alleged above, the members of the Class still do not know that they have been and continue to be injured by Defendant's discriminatory conduct

37.     Defendant's discriminatory conduct is continuing in nature and Defendant has committed discriminatory acts throughout the limitations period.

38     There is a substantial nexus between the acts of discrimination occurring within the limitation periods prior to filing suit and the acts of discrimination before that time. The acts involve the same type of discrimination and are recurring, not isolated, events.

39.     Defendant has actively concealed its discriminatory and other wrongful conduct in order to prevent, and indeed has succeeded in preventing, Plaintiffs and Class Members from discovering its racially discriminatory lending and marketing tactics. Defendant specifically misled Plaintiffs and Class Members into believing that the terms of its loans offered were fair,

reasonable, and the same as offered to Caucasian borrowers, and took steps to conceal its fraudulent and unfair conduct

40.     The statute of limitations applicable to any claims which Plaintiffs or other Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of Defendant's fraudulent concealment. In addition, Plaintiffs and the Class did not and could not have discovered their causes of action until the time alleged below, thereby tolling any applicable statute of limitations.

41     Defendant, through various devices of concealment and secrecy described above, affirmatively and fraudulently concealed the existence of its unlawful and discriminatory scheme and course of conduct from Plaintiffs and Class Members. Plaintiffs and Class Members had no knowledge of Defendant's scheme and unlawful conduct and did not learn of or discover Defendant's fraudulent course of conduct until the filing of this action.

### PLAINTIFF PORTER STADAKER

42.     Porter Stadaker is an African-American resident of Nashville, Tennessee. Prior to refinancing with Ameriquest, Stadaker had a fixed rate loan with Citifinancial, with a monthly payment of $650.00, not including taxes or insurance.

43.     Stadaker was contacted by Ameriquest via unsolicited mail and relentless phone calls. When Stadaker first returned Ameriquest's phone calls, he spoke with an Ameriquest representative named "Kahil," who operated out of an office near Nashville, Tennessee. "Kahil" quoted Stadaker a fixed five or six percent (5% - 6%) interest rate which he said would increase only slightly at the beginning of the loan. Stadaker insisted that his taxes and insurance be included in the loan payment.

Case 3:07-cv-00409   Document 1   Filed 04/13/07   Page 12 of 28 PageID #: 12

44.     Ameriquest arranged for and paid for the appraisal of Stadaker's home, during which Ameriquest inflated the value of Stadaker's home. The home was originally valued at $130,000 however, just six months later when he attempted to refinance with Ameriquest, it valued his home at only $95,000.

45.     Approximately one day before Stadaker's loan was scheduled to close, which was just one week after he first spoke with "Kahil," Stadaker was told that Ameriquest would offer him a slightly different deal, which was the "2/28 credit rebuilding loan" with an 8 5 percent (8.5%) interest rate. "Kahil" promised Stadaker that if he took this loan he would be able to refinance in a couple of years for a fixed rate conventional loan

46.     On the day his loan closed, Stadaker did not realize that he was going to Ameriquest's office to close his loan; he believed he was going to meet with "Kahil" to discuss a closing date. While he was in the Ameriquest office, Stadaker was given numerous documents to sign. As Stadaker's initial application was done over the phone, he never had an opportunity to review the documents prior to closing.

47     Stadaker's total loan amount was $92,500.00, which consisted of $68, 458.00 on his prior mortgage, $1,092 00 in taxes, and $15,000.00 in cash    According to the loan paperwork, Stadaker was charged $7,847.63 in fees and points on his loans, with $2,142 00 of that amount paid to others for services provided to close the loan. Despite these costs, Stadaker was never told about any amounts associated with the closing of the loan, was never provided a good faith estimate by Ameriquest, and was not aware of any prepayment penalties.

48.     Stadaker's loan with Ameriquest closed on April 21, 2006.

49.     Stadaker's loan was taken on the understanding that the terms offered and the rates and fees charged were fair and reasonable. Ameriquest never disclosed or otherwise

informed Stadaker that he would be targeted and given less fair terms on his loan based on his race.

## PLAINTIFF LEE DUNBAR

50    Plaintiff Lee Dunbar is a 56 year old, African-American, resident of Omaha, Nebraska, and is a member of the Class alleged herein

51    Dunbar first contacted Defendant Ameriquest Mortgage Company in March 2005 as he was interested in refinancing his loan so that he could have money to build a garage  Prior to contacting Defendant, Dunbar had a fixed interest rate loan from Household Finance with a monthly mortgage payment of approximately $600.00 including taxes and insurance.

52.    Upon speaking with an Ameriquest representative, Dunbar provided his loan application information.  The Ameriquest loan officer stated that he could only offer a high adjustable rate because of Dunbar's credit history but stated that Dunbar could refinance after six months with a lower rate

53    An Ameriquest appraiser inflated the value of Dunbar's home, valuing it at $132,000.00.

54.    The loan officer quoted Dunbar's $108,000.00 loan at an interest rate of ten percent (10%); however, at closing, the rate was 12.25 percent (12.25%)  The loan officer also stated that Dunbar's monthly payment would be approximately $1,000.00; however, the actual payment was $1,292.00.

55    Due to the high cost of closing fees Dunbar did not receive the cash he requested to build his garage, which was the reason he sought refinancing in the first place

56. Dunbar's loan was closed within two weeks of his contacting Ameriquest. Six months afterwards, he attempted to contact the Ameriquest office to refinance only to find that the office had been shut down and ordered out of the state of Nebraska.

57. Due to his financial difficulty, Dunbar put his home on the market for $114,000.00; however, Dunbar's Real Estate Agent advised him that $114,000.00 was too high of a price for the home, despite Ameriquest's $132,000.00 appraisal.

58. Due to the interest rate on his loan continuing to rise up to sixteen percent (16%) and his monthly mortgage payment increasing to over $1,600.00, Dunbar was forced into bankruptcy and is faced with losing his home.

59. Dunbar's loan was taken on the understanding that the terms offered and the rates and fees charged were fair and reasonable. Ameriquest never disclosed or otherwise informed Dunbar that he would be targeted and given less fair terms on his loan based on his race.

## PLAINTIFF RAYMOND THOMAS

60. Raymond Thomas is a 50 year old, African-American, resident of Forth Worth, Texas.

61. On or around late May or early June 2004, a representative for Ameriquest Mortgage Company, Larry Alton from the Arlington, Texas office, contacted Thomas's wife, who he resided with but was not married to at the time. As the couple's home had been paid for in full with cash in 2000 the Ameriquest representative solicited their interest in a home equity loan.

62. The Ameriquest representative stated that Thomas's wife's credit was not good enough to obtain the loan and asked her if she had a boyfriend whose credit she could use. The

loan officer obtained the specifics on Raymond Thomas at that time and the decision was made to proceed using his credit.

63. Thomas advised Alton that he was not working at the time; however, Alton assured him they would "take care of it" by drafting a document stating that Thomas made $3,500.00 per month as a contractor

64. Thomas was initially quoted an eight percent (8%) interest rate; however, at the closing table, the interest rate rose to a 12.25 percent (12.25%) adjustable rate. Thomas was advised not to worry about the 12.25 percent (12.25%) rate because he could refinance for a lower rate in one year.

65. During the loan application process, an Ameriquest appraiser visited the Thomas home and spent approximately five minutes performing an appraisal. The appraised value was $100,000.00.

66 Thomas advised that he only wanted to borrow $30,000.00, but was told by Alton that he had to borrow a minimum of $65,000.00 After closing costs, Thomas received only $54,000.00, with $3,200.00 in closing fees for discount points to gain a lower interest rate Ameriquest never explained the interest rate arrived at, the excessive closing fees charged, or that the loan had any prepayment penalties.

67. Thomas's monthly payment continues to increase and is now up to $681.00 per month, not including taxes and insurance. Due to the high payments, after one year Thomas contacted Ameriquest and was refused a new loan, despite Ameriquest's assurance that he could refinance after one year of obtaining his loan.

68. Thomas's loan was taken on the understanding that the terms offered and the rates and fees charged were fair and reasonable. Ameriquest never disclosed or otherwise informed Thomas that he would be targeted and given less fair terms on his loan based on his race.

## PLAINTIFF DARREL POWE

69. Plaintiff Darrell Powe is a 39 year old, African-American, resident of Heidelburg, Mississippi.

70. In December 2004, Ameriquest solicited Powe to refinance his mortgage and he provided his loan application information. All of Powe's communications were via telephone with Ameriquest loan officers in the Mobile, Alabama office.

71. Prior to doing business with Ameriquest, Powe had an $87,000.00 mortgage with Midstate with a six percent (6%) fixed interest rate for which he paid $669.99 monthly, not including taxes and insurance.

72. During his loan application process, Ameriquest appraised Powe's property at $126,000.00.

73. Ameriquest stated that Powe would receive a six percent (6%), or slightly higher, interest rate. However, when Powe received his good faith estimate, none of the information was correct. When the title loan officer came to Powe's house for closing in December 2004, the interest rate was ten percent (10%) fixed for the first two years and then converted to an adjustable rate. Powe was never given an explanation of the increase to a ten percent (10%) interest rate.

74. At closing, Powe was to receive approximately $2,000.00 in a cash payout; however, he only received $200.00. He was told by Ameriquest that his low credit score caused

an increase in closing fees, eliminating most of the cash payout. Furthermore, Powe's loan also contained prepayment penalties.

75. Powe's stated loan amount was $94,000.00. As a result of Hurricane Katrina, Powe fell behind on his mortgage payments. Instead of placing his missed payments at the end of his loan, as other Mississippi mortgage companies were doing at the time, Ameriquest advised Powe in November 2005 that they were increasing his monthly mortgage payment and that he had to pay $1,480.00 to put the repayment plan into effect.

76. Powe's monthly payment was originally $804.00 and in January 2006 his payment had risen to $1,099.00 per month.

77. Powe's loan was taken on the understanding that the terms offered and the rates and fees charged were fair and reasonable. Ameriquest never disclosed or otherwise informed Powe that he would be targeted and given less fair terms on his loan based on his race.

## CLASS ACTION ALLEGATIONS

78. This case is brought as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure because Defendant has acted or refused to act on grounds generally applicable to the Class. In addition, Plaintiffs seek certification of a Rule 23(b)(3) punitive damage class. Plaintiffs seek certification of this action as a class action on behalf of the Class defined above.

79. This action is appropriate as a class action pursuant to Rule 23. Defendant has engaged in a common course of racially discriminatory conduct in the marketing, formation, and servicing of the loans given to Plaintiffs and Class Members and in the terms of those loans.

80     Membership in the Class is so numerous that separate joinder of each member is impracticable  The number of Class Members is unknown but can be readily determined from the records of Defendant  Plaintiffs reasonably estimate that there are thousands of persons in the Class. Although Plaintiffs do not presently know the names of all Class Members, the Class is ascertainable and the identities and addresses of Class Members' can be obtained from Defendant's records.

81.    Plaintiffs are members of the Class of victims described herein  They have loans from Ameriquest secured by their residences and were subjected to Defendant's fraudulent and discriminatory scheme and common course of conduct

82.    There are numerous and substantial questions of law and fact common to all Class Members which control this litigation and which predominate over any individual issues. Included within the common questions are:

        a      Whether Defendant discriminated against Class Members by target marketing loans to African-American neighborhoods for the purpose of encouraging the residents of these areas to enter into predatory loan contracts by lending African-Americans loans with less favorable terms than loans offered to similarly situated Caucasians;

        b      Whether Defendant's intent in its discriminatory policies and practices was racially motivated;

        c.     Whether Defendant maintained a corporate policy to market loans on a racially discriminatory basis by specifically targeting African-Americans for subprime loans or similarly disadvantageous loans and of concealing material information from Plaintiffs and Class Members such as the fact that the loans were not given under the

same terms and conditions as those offered to similarly situated Caucasians;

      d.     Whether Defendant trained, directed, or determined that its agents conceal or not disclose Defendant's discriminatory practices in the marketing, lending, and servicing of the loans;

      e.     Whether Defendant devised and deployed a scheme or common course of conduct which acted to defraud or deceive Plaintiffs and Class Members and/or exacted unreasonable, unconscionable and/or discriminatory loans by taking advantage of its position of superior knowledge and otherwise;

      f     Whether Defendant systematically failed to disclose to Plaintiffs and Class Members material information such as the actual basis on which loan terms were determined;

      g.     Whether Defendant systematically discriminated against Class Members and engaged in a deceptive scheme and common course of conduct in targeting an economically disadvantaged segment of the population for the lending of subprime loans;

      i.     Whether Plaintiffs and Class Members are entitled to specific performance, injunctive relief and/or other equitable relief against Defendant;

      j     Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Defendant; and

      k.     Whether Plaintiffs and Class Members have sustained damages and the proper measure of those damages

83.     The claims of Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interests which are adverse to those of the Class

84     Plaintiffs will fairly and adequately protect the interests of the Class and have

retained counsel experienced and competent in the prosecution of lending class actions and similar types of complex litigation

85. Plaintiffs seek preliminary and permanent injunctive and equitable relief and punitive damages on behalf of the entire Class because Defendant has acted or refused to act on grounds generally applicable to the entire Class

86. Certification of a punitive damage Class pursuant to Rule 23(b)(3) meets the superiority and manageability tests required under the Rules of Civil Procedure.

87. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Class Members will continue to suffer damage, and Defendant's violations of law will proceed without remedy while Defendant continues to retain the proceeds of its ill-gotten gains

88. Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation, the size and scope of Defendant's uniform lending scheme, and the significant costs attendant to litigation on this scale

89. This action will result in an orderly and expeditious administration of Class claims Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured

90. This action presents no difficulty that would impede its management by the Court as a class action, and a class action is superior to other available methods for the fair and efficient adjudication of the claims

## COUNT I

### (Racial Discrimination – 42 U.S.C. §1981)

91. Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

92. Defendant intentionally discriminated against Plaintiffs and Class Members by contracting with them on terms and conditions less favorable than the terms of loans given to similarly situated Caucasian borrowers in violation of 42 U.S.C. §1981.

93. By charging higher premiums to Class Members, Defendant unlawfully discriminated against Plaintiffs and Class Members in (i) formation of contracts; (ii) making, performance, modification, and termination of contracts; (iii) the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and/or (v) conduct that interferes with the right to establish and enforce contract obligations.

94. Defendant's actions violate 42 U.S.C. §1981, as well as the rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth Amendments to the Constitution of the United States.

95. Defendant has damaged Plaintiffs and Class Members because Plaintiffs and the Class have suffered economic loss as a result of Defendant's illegal racial discrimination.

96. At no time has Defendant undertaken corrective action to ameliorate its racially discriminatory practices now embedded in the Loans taken by Plaintiffs and Class Members. Defendant continues to reap the profits of its discriminatory practices and continues to discriminate against African-Americans.

97.     Defendant's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. As a result, Plaintiffs and Class Members are entitled to punitive damages.

## COUNT II

### (Race Discrimination – 42 U.S.C. §1982)

98.     Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

99.     A loan is personal property within the meaning of 42 U.S.C. §1982.

100.     Defendant's actions affect Plaintiffs' and Class Members' rights to purchase or hold real or personal property within the meaning of 42 U.S.C. §1982.

101.     Defendant has discriminated against Plaintiffs and the Class with respect to the loans they borrowed and/or were targeted to borrow. Plaintiffs and the Class have not had the same right as Caucasians to borrow loans and they were denied the same right as Caucasians to learn of different types of loans offered by Defendant. Defendant has, as a result, violated 42 U.S.C. §1982.

102.     Defendant exploited a situation created by socioeconomic forces tainted by racial discrimination whereby African-Americans either pay excessive fees or are refused altogether from obtaining loans to purchase housing, while if they take a loan to purchase a home, they disproportionately encounter oppressive terms and exorbitant prices relative to the terms available to Caucasians for comparable home loans.

103. Because African-Americans are more likely to take out subprime loans, this results in higher defaults and will likely exacerbate the wealth gap between African-Americans and Caucasians

104. Defendant's discriminatory practices create a dual lending market, one for Caucasians and another for African-Americans, with loans readily available to African-Americans having less reasonable terms than loans readily available to similarly situated Caucasians.

105. Plaintiffs and the Class have continued to hold subprime loans and/or be exposed to Defendant's target marketing of subprime loans to African-Americans within the time period allowed under Plaintiffs' claims.

106. As a proximate result of Defendant's violations of 42 U.S.C. §1982, Plaintiffs have been damaged. In addition, Defendant's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. As a result, Plaintiffs and Class Members are entitled to punitive damages.

## COUNT III

### (Race Discrimination - 42 U.S.C. §3604)

107. Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

108. Home loans and access thereto are covered by the Fair Housing Act, 42 U.S.C §3601 *et seq*

109    Plaintiffs and Class Members are African-Americans who were exposed to Defendant's discriminatory marketing scheme and/or obtained loans from Defendant that were discriminatory in nature due to Defendant's practices

110    Due to Defendant's tactics African-Americans typically borrowed loans with terms less favorable than loans borrowed by Caucasians   These less favorable terms indicate discrimination based on race in the terms, conditions, or privilege of services in connection with the sale of a dwelling in violation of 42 U.S.C. § 3604(b).

111.    Defendant's targeting marketing of African-Americans for the borrowing of subprime loans indicates or intends to make a preference, limitation, or discrimination based on race

112.    Defendant violated 42 U.S.C. §3604(c) by making, printing, publishing, or causing to be made, printed, or published notices, statements, or advertisements with respect to the sale of a dwelling, via a home loan, which indicated or intended to make a preference, limitation, or discrimination based on race.

113.    By target-marketing subprime loans to African-Americans as alleged herein, Defendant seized upon and took advantage of the opportunity created by the existence of subprime loans and the historical difficulty African-Americans have had in obtaining credit, thus exploiting African-Americans

114    The discriminatory marketing and lending intentionally perpetrated by Defendant have a disparate impact on African-Americans, including Plaintiffs and Class Members, who either borrowed or attempted to borrow loans from Defendant.

115.    Defendant's conduct, in violation of 42 U.S.C. §3604 and alleged herein, is a direct and proximate cause of injury and damage to the Plaintiffs and Class Members. As result,

Plaintiffs and Class Members are entitled to equitable and legal relief. In addition, Defendant's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. As a result, Plaintiffs and Class Members are entitled to punitive damages

**COUNT IV**

**(Race Discrimination - 42 U.S.C. §3605)**

116. Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 90 above as if fully set forth herein

117 Defendant's business of financing and refinancing home loans constitutes engaging in real estate-related transactions within the meaning of 42 U.S.C. §3605(b).

118. Defendant discriminated against Plaintiffs based on race, in violation of 42 U.S.C §3605(a) by specifically targeting African-Americans for subprime loans. As a result, Defendant did not make equally available the same home loan transactions to African-Americans in contrast to those readily available to Caucasians

119. Defendant discriminated against Plaintiffs based on race, in violation of 42 U.S.C §3605(a), in the terms and/or conditions of its loans which were made readily available to African-Americans and were less favorable than loans made readily available to Caucasians.

120. The discriminatory marketing and lending intentionally perpetrated by Defendant have a disparate impact on African-Americans, including Plaintiffs and Class Members, who either borrowed or attempted to borrow loans from Defendant.

121. Defendant's conduct, in violation of 42 U.S.C. §3605 and alleged herein, is a direct and proximate cause of injury and damage to the Plaintiffs and Class Members As result,

Plaintiffs and Class Members are entitled to equitable and legal relief. In addition, Defendant's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. As a result, Plaintiffs and Class Members are entitled to punitive damages.

**WHEREFORE**, Plaintiffs demand judgment and orders against Defendant on behalf of themselves and Class Members as follows:

(1)     An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representative for the Class and undersigned counsel as counsel for the Class;

(2)     Granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including rescission, reformation, attaching, impounding or imposing a constructive trust upon, or otherwise restricting, the proceeds of Defendant's ill-gotten funds to ensure that Plaintiffs and Class Members have an effective remedy;

(3)     Awarding punitive damages to Plaintiffs and Class Members;

(4)     Granting declaratory and injunctive relief and all relief that flows from such injunctive and declaratory relief;

(5)     Awarding Plaintiffs and Class Members their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs; and,

(6)     Granting such other and further relief as the Court deems just and proper including, but not limited to, recessionary relief and reformation.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury

Respectfully Submitted,

**GLASSMAN, EDWARDS, WADE & WYATT, P.C.**

BY: _____

B. J. Wade (#5182)
Lewis W. Lyons (#24577)
Edwin E. Wallis, III (#23950)
26 North Second Street
Memphis, TN 38103
(901) 527-4673 – telephone
(901) 521-0940 – fax
bwade@gewwlaw.com
llyons@gewwlaw.com
ewallis@gewwlaw.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Christa Collins
J. Andrew Meyer
Nicole Mayer
**JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.**
One Urban Centre, Suite 550
4830 West Kennedy Boulevard
Tampa, FL 33609-2589
(813) 286-4100 – phone
(813) 286-4174 – fax